Our third case is 23-1783 Metropolitan Washington Airports Authority v. Pan. Ms. Maley. Good morning, Your Honors, and may it please the Court. I'm Erica Maley, and with me at council table is Jordan Minot. We represent Gary Pan, Commissioner of the Virginia Department of Labor and Industry. And I'd like to reserve four minutes for rebuttal. The agreement creating the Metropolitan Washington Airports Authority does not preempt Virginia's workplace safety laws from applying at the airports. Many airport workers have hazardous jobs, such as mechanics and first responders. Lack of safety protections for these workers leads to preventable injuries. Here, for instance, a worker's finger was amputated due to the authority's violation of Virginia's safety regulations. The district court erred in permanently enjoining Virginia from applying these safety regulations at the airports. Nothing in the agreement expressly preempts the regulations, nor do they conflict with any provision of the agreement. The authority's claims here fail for two separate reasons, and first I'd like to turn to that issue of preemption. Far from expressly or impliedly preempting the workplace safety laws, the agreement here expressly reserves Virginia's concurrent police power authority over the airports. Counsel, that's your first argument now in your brief, but you didn't raise it before the district court, and we normally wouldn't consider an argument that was forfeited before the district court, so why should we make an exception here? Yes, Judge Harris, I believe we did raise it before the district court and that the district court did decide it. I think it's fair to say we've put somewhat of a finer point and more emphasis. You told the district court this concurrent police power provision expressly reserves to you this regulatory authority? Not at that level of detail. So this provision on which you're relying now was not argued before the district court? We did not cite this particular provision, however, waiver is not normally construed at quite that level of detail. It might be. This is a very big argument. It is now your leading argument is like, hang on, we have this provision that reserves concurrent police power with the federal government, and that is the answer to this case, and the district court never had a chance to pass on that. And as I assume we will explore, I think there are some questions that raises where it really would have been beneficial to get the district court's views, but we have none of that. The district court actually did construe the same provision of the agreement, section 158, and it construed it as referring simply to... That's because it was construing subsection C, which obviously does apply only to police, law enforcement police, because it's about the jurisdiction of the state police department of Virginia. So the district court was right. That one absolutely refers to law enforcement police, and the district court had no opportunity to consider whether there was something else out there that might be different. I believe we did raise an issue that's close enough to this issue, which is the agreement that the agreement does not preempt Virginia's workplace safety laws. However, even if the court were to disagree, I think the analysis does come out the same, because it still comes back to this question of, is there anything in the agreement that either expressly or impliedly preempts the workplace safety laws? And there isn't. The authority hasn't cited to any provision of the agreement that expressly preempts the laws. The authority hasn't cited to any provision that they say is in conflict, and the district court itself found the agreement to be silence as to workplace safety, and then concluded that the silence was preemptive. So why isn't that right when you're dealing with, admittedly, perhaps not a bi-state compact, but a compact of some form between the District of Columbia and Virginia? Why isn't silence the answer with respect to the question of whether or not one of the parties has actually preserved one of its powers traditional powers that they would otherwise have? It's not preemptive under Supreme Court precedent. Cases such as Tarrant and New York v. New Jersey expressly address this, and they say that compacts should be interpreted with the understanding that a state does not easily cede its sovereignty, and therefore the silence of a compact on an issue shouldn't be construed to preempt statehood. But that's different. The issue here, and I thought the issue here was that when two, let's call them two polities, agree to create a joint polity entity, which didn't have in Tarrant, obviously the assumption is that one of them doesn't walk away, having said that the other polity gets unilateral, exclusive regulatory control. Why would anybody agree to that? So the assumption is that both of them have given up the opportunity to exercise unilateral control once they entered into this agreement. And you can reserve, if you want to, expressly, if both parties agree, one state or polity could reserve unilateral control, but you don't read it into an agreement that by definition involves two parties or polities giving up exclusive control. Respectfully, Judge Harris, that's not the analysis that the Supreme Court has undertaken. And New York v. New Jersey did involve a multi-jurisdictional entity, in that case a port authority. But the question there wasn't whether has one of these states reserved unilateral control over the entity. It was just can a state leave the agreement. That seems like a different question. It is a question of the extent to which the state has ceded its sovereign authority, and that is how the Supreme Court interpreted it in New York v. New Jersey. And it said even if that agreement was certainly ceding the state's authority over the port authority to some degree, and yet the question of to what degree has the state ceded its authority, the Supreme Court said if an agreement is silent, the silence shouldn't be interpreted as preemptive, and instead the court should apply ordinary principles of express and implied preemption doctrine. And under ordinary principles, it's not preemptive unless it's either expressly preempted or unless there's some conflict. And here we don't have either. So you're saying if, let's just say like Texas and Oklahoma enter into a bi-state agreement, they establish the Tex-Oak entity, a bi-state entity, the agreement doesn't say anything about who's reserving what powers. Oklahoma can come into court and say, yes, we have unilateral control over this entity. Texas has none, and the reason that is so is because the agreement says nothing. That just strikes me as like absolutely inconsistent with even just common sense. Why would Texas have agreed to that? If the agreement says nothing, then each state retains its ordinary sovereignty. But they can't each have unilateral control. Only one of, like Virginia here is saying we're the only, they're not saying D.C. gets to apply its workplace safety regulations, are they? No, because in this instance, the airports are on Virginia territory. And so in the absence of an agreement, the ordinary rule would be they're on Virginia's territory, therefore Virginia's police power applies to these entities. And if the district or the authority is to have police power over them, then that would have to come from the agreement. And so to the extent there would be a conflict with any of the powers granted to the authority, then Virginia's regulatory authority would be to that degree constrained. However, to the extent the agreement is silent, Virginia's regulatory powers continue to apply. And Virginia has been applying its... I'm sorry, this is my last question. You're saying it's because the airports are in Virginia, but I thought what was at issue here is who has control over MWAA as an entity. And so I don't see why Virginia would necessarily have rights superior to D.C.'s when it comes to that. I don't think that is exactly the issue, Judge Harris. Why is it not exactly the issue? Isn't the fine being levied against the MWAA? It's being levied against the MWAA for conduct and events that occurred at the airports on Virginia's soil. Now, if Virginia were attempting to regulate conduct that the authority engaged in in another state that didn't have any connection to Virginia's territory, perhaps that would present another question. Although the authority, the agreement here does also expressly provide that in any claims brought either by or against the authority, Virginia law should apply. That's also in the agreement. Can I ask you a question about the text of the section that you began to lead with? Sure. That is the express reservation of rights of police power authority. The language says that the Commonwealth hereby grants, and I'm reading from the Virginia state law, hereby grants, accepts and agrees to concurrent police power authority over the Metropolitan Washington Airports. And that's a defined term under the federal statute distinguished from the Metropolitan Washington Airport Authority. So assuming that this is the basis for police power authority, why isn't that limited to the airports and not the authority? And you could read it in a way that suggests that the airports, to the extent that they hire private employees, Virginia has the right and ability to protect those employees. But when it comes to the authority, which is a separately defined term in the statute, Virginia has no authority over those employees. The ordinary meaning of reserving concurrent police power authority over the airports would be for conduct and events occurring at the airports. So again, to the extent the authority is engaging in conduct that's not at the airports, perhaps that provision wouldn't apply. But here the conduct was at the airport. A worker was injured at the airport due to the authority's failure to properly supervise that these safety regulations were being applied and enforced at the airports. And so all of the relevant conduct for the fine was occurring at the airports. So an authority employee who ventures off the grounds of the airports, driving a car or something, gets in an accident, or someone causes harm to that employee who's a Virginia resident, that it happens outside the geographic boundaries of the airport, your position is that Virginia has no authority over that? Well, if he got into an accident in Virginia. But if he didn't? If he got into an accident in the District of Columbia, then that would likely fall within the District of Columbia's jurisdiction and not the airports. We're not claiming to have plenary or unilateral control over the authority. It's just that the terms of Virginia's sovereignty and the extent to which that's been ceded is defined by the agreement itself. And the agreement says that Virginia law applies to the airports and it says Virginia law applies to the authority as well in all claims. I totally get that when we're talking about Virginia's ability to regulate the physical land that the airports sit on. Because imagine a world the day before this entity is created. Virginia has sovereignty, although not really because the federal government had the land, so then Virginia probably didn't have the ability. But I don't know where the default assumption that Virginia gets to regulate compact entities is. In fact, my assumption is that states don't have the authority, that the default rule is that states don't have the authority to regulate compact entities except as specified in the compact. So let me ask you this. Are you aware, are there any other compact entities that you are aware of where the compact creating the entity has been held to make the entity itself, I don't mean the land the entity's on, I don't mean the people the entity contracts with, where the entity itself has been held to be subject to the state's police power regulation? I'm not aware of another case. So when you mention people get hurt working at the Washington Metropolitan Airport, I've got to imagine a whole bunch of people who work for the Port Authority of New York and New Jersey have been hurt before. I think we can probably take judicial notice of the fact that that's probably happened. Do New York and New Jersey attempt to regulate the employees of the Port Authority? I don't know the answer to that, Judge Haytens. I'm not aware of a case that's addressed that on either side. However, again, I do think the Supreme Court's analysis in New York versus New Jersey is very relevant here, and it said that the ordinary rule, it's the same as any other preemption doctrine case, and it should be analyzed with the presumption that a state didn't see this authority. That's the case about whether a state can leave, right? That's the case about whether a state can leave. That's correct. States do have a sovereign power to not enter into agreements they don't want to enter in. The default assumption is that no state can be made to enter into an interstate agreement they don't want to enter in. So that's the background sovereignty. But I don't know where the background principle of sovereignty is that, say, states are presumptively entitled to regulate entities whose existence was A, with their consent, and B, required an act of Congress. I know this isn't a perfect analogy, but, for example, the presumption is that Virginia doesn't get to regulate federal entities, right? So, again, I'll take judicial notice of the fact that Amtrak operates through lots of Virginia's territory, and I know there's a statute that allows states to regulate Amtrak, but the default assumption is that Virginia would not get to regulate Amtrak, right? There's no presumption against preemption. The presumption is you don't get to regulate a federal entity. So why isn't the presumption also that you don't get to regulate a compact entity? It's just the Supreme Court has never analyzed it that way. It's described as a preemption question, and in Tarrant, for instance, it cites the fidelity, savings, and loan, and that's not a compact case at all. That's a preemption case that walks through ordinary principles of express and implied preemption. But I would also say the Supreme Court's also said in multiple cases that each agreement depends on the terms of the agreement, and here the agreement says again and again that Virginia law is going to apply. So even if ordinarily, even if you assume that in an ordinary compact agreement that's not how it works, that is the terms of this compact. The terms of the compact where? I know there's something that says Virginia law will apply to tort and contract suits against the MWA. Is there anything else that says Virginia law applies to the MWAA as an entity? Yes, it's the same provision, which is 173 in the Virginia Code. You're referring to section B of that, and subsection A says on all claims brought by or against the authority, Virginia courts shall have jurisdiction and Virginia law shall apply. And I'd like to turn just very briefly to our second argument, which is that this isn't an interstate compact within the meaning of the compact clause at all. And again, as we said in our brief, we don't think the court necessarily needs to reach this issue, but if the court were to conclude that there are special interpretive principles that apply only to interstate compacts, then it becomes important to determine if this is an interstate compact or not. I don't mean this question to be as potentially cutesy gotcha as it's going to sound, but what do you think this entity is? Because I guess here's the possibilities. One possibility is it's a compact entity, which, by the way, Kirpin says it is. That's dicta. I get that. Okay. And maybe that's dicta. But there's some other possibilities. One is it's a federal entity. We can't say that. Kirpin holds it is not a federal entity, so it has not opened us to say that it's a federal entity. Kirpin also holds that it's not a private entity, so it's not open for us to say that it's a private entity. I think the terms of the compact expressly disclaim any idea that it's a creature of the Commonwealth of Virginia or a creature of the District of Columbia because the compact says it is not a creature of the Commonwealth. So what do you think this entity is? It's a multi-jurisdictional entity created by agreement between the Commonwealth of Virginia and the District of Columbia with the consent of Congress. So it's not a federal instrumentality, and it's not an agency of either the District or the Commonwealth solely. So why did—can I—again, why does it matter in the sense of the following? The compact—a lot of your argument reads as if the compact clause is the source of power to do something, but it's not a source of power to do something. It's a limitation on the power to do something. So, like, I mean, if your argument is really true, it would suggest to me that absent the Home Rule Act, D.C. could enter into agreements with other entities without the consent of Congress. But I don't see how the flip side is true. Tell me—why does it matter? Like, if anything, if the District of Columbia is incapable, notwithstanding the Home Rule Act, of invoking—it's not subject to the compact clause, so what? Like, I genuinely don't understand why this matters. So, in our view, essentially it might be the same analysis either way, but that turns on the court agreeing with our position that an interstate compact, as a fact on state law, is interpreted the same as any other preemption question. And if that's true, we're not disputing that the District of Columbia can enter into an agreement with the Commonwealth of Virginia, with Congress' consent, and that it did so here. The question is simply, well, what effect does that have on state law? And if there's special rules, as my colleague on the other side has argued, that apply only under the compact clause, then it does become important to say, well, is this a compact clause entity, or is this an agreement that the District entered into with Columbia pursuant to the Home Rule Act? And we think it's the latter. Obviously, to the extent it's simply a restriction on the ability to enter into an agreement, then Congress can impose that same restriction on the District pursuant to the Home Rule Act. But if it gives some special ability to sweep away a state's law because of the nature of an interstate compact, that has no application here, because this is not a compact within the meaning of the interstate compacts clause. I'd like to reserve the remainder of my time for a bottle if the Court has no further questions. Mr. Heppin. Thank you, Your Honor. I'm Bruce Heppin for the Metropolitan Washington Airports Authority. With me today is my colleague Claire McKenna. I would like to respond to a couple of things that my colleague mentioned today about, I think the Commonwealth only starts in the wrong place when it says, is there anything in the compact which expressly preempts? That's not the compact analysis. That's not the way intergovernmental agreements are interpreted under Hess v. Hess, the Port Authority case from the Supreme Court in the 1990s, under the Delaware River Toll Bridge Authority case, a case in which the Supreme Court declined certiorari from the Third Circuit, under the C.T. Helmuth decision, which the Attorney General favorably quoted from. It's in Joint Appendix 63 from its 2012 decision in Marshall. In the District Court decision from the Federal Court in Missouri, interpreting a compact between Missouri and Illinois, the Bi-State Development Authority. And finally, in the Seattle Master Builders case. These are all referred to in a footnote in our brief. In all those cases, it's the same idea. The same idea being that unless a state reserves its power in the interstate compact, this mere act of entering into a compact is the cessation of authority over the compact entity. And if you will, I'd like to read something. Wait, a cessation or the lack of acquisition of? I believe that Hess refers to the cessation of. Just give me one minute. While you're doing that, can I just make sure I understand something about the scope of the argument that you're making? I don't know why this possibly is better call Saul. But I just have this example of the worker who works at the Cinnabon at Dulles, who like gets injured while working at the Cinnabon at Dulles. Does ruling for you, and this is not an employee of EMWA, this is an employee of a Cinnabon franchisor at Dulles Airport. Does ruling for you mean that Virginia doesn't have the authority to protect the safety of the worker who works for the Cinnabon? Absolutely not. That's, in fact, we think that's the Singleton case. The Singleton case distinguishes between the Commonwealth's authority over many of those airport workers, be they concession employees. And what about if one passenger torts another passenger in the concourse at National Airport? Does that have anything to do with this case? No, nothing. So this is from Hess. An interstate compact by its very nature shifts a part of the state's authority to another state or states, or this is the case here, or to the agency the states jointly create to run the compact. And that was a point that was made in the briefs. There are two different basic kinds of compacts. There are the Tarrant is a water rights case. Those kind of cases like the cases involving borders between states, those do not create a separate entity. But when you create a separate entity, be it the Port Authority, be it the Washington Metropolitan Area Transit Authority, be it the Airports Authority of necessity, and that's again from Hess, by state entities created by compact, however, are not subject to the unilateral control of any one of the states that compose the federal system. And if I may, I also want to just share something from the Delaware River Toll Bridge Commission versus Secretary of Pennsylvania Department of Labor and Industry, which had the same kinds of considerations that my learned colleague mentions here, the concerns for the state worrying about the safety of people, worrying about the safety of employees. And that case said, and this is kind of a response to Tarrant, although courts must be hesitant to find a surrender of sovereignty where it is ambiguous, the creation of a by-state entity pursuant to the compact clause is an unambiguous surrender. By expressly creating the by-state entity, the compacting states relinquished all control over the entity unless otherwise stated in the compact. And that is the specific idea of the creation of an interstate compact. And no matter how you are going to, how this court might come out on the question of whether the district is a state for purposes of the compact clause, you are still going to have to interpret this agreement because it is a federal, it is interpreted, it has to be interpreted as a matter of federal law and as a matter of federal law you are going to end up in the same place. Can I ask you a question about as a matter of federal law? So this is 49 U.S.C. 49111C, right? Yes. It says Virginia shall have concurrent police power authority over the airports. Now let's bracket the argument that we discussed with your colleague which is, I'm not sure that refers to the entity because, but let's assume away that problem for the moment. But police power, I have to tell you that when I read those words, I don't think that means just cops. Like as a person who like went to law school and used to teach at a law school, when I see the words police power, that to me is a common law code word for health and safety regulation, not just uniformed cops. So what do I do with that? Well, it's important to know what 4911C is. It is, so the airports authority, I'm sorry, the airports, both Dulles and DCA, they became special entities while the, when they were federally run airports, because these are the unique entities in that they are owned, the land is owned by the United States. So what 49111C did was it, they were federal enclaves, and they needed to make them take, get that undone. And that's what 49111C does. It's a retrocession. I think it's very important to recognize, and this comes from Kirpin. Kirpin recognizes that the airports authority existed before the Transfer Act. So Kirpin clearly says that the airports authority came into existence in 1985, which is when the compact was agreed to by Virginia and the district. So this can't really change the nature of the airports authority. The point of the overall part of the Transfer Act was to authorize the United States Secretary of Transportation to enter into a lease with the airports authority, but it did not grant powers. It was retroceding the Commonwealth's power over the land. But the transfer authority is very clear because it has separate definitions of the airports authority is defined as one thing, and the airports are defined as something else. Like I said, I understand that argument, and that may be a winning argument for you, but I guess you'd agree, generally speaking, in legal discourse, when we say X has police power, we don't normally interpret police power as meaning literally uniformed officers to enforce the criminal law. We mean that as a common law code for a cluster of powers that the sovereign generally has, including, I would say, health and safety regulation, right? Yes. We have not challenged the meaning of police power. And just to go back to Judge Harris's concern, that was never discussed below because it wasn't presented. There wasn't any part of 158 that was presented to the district court. I'm sorry. Just to be clear, you say you don't challenge the meaning of police power as a general principle or as defined in this statute? As a general principle. Okay. What about this statute? That's what I was trying to explain. So 158A, which is not part of the compact because it was not adopted. At least I was not talking about 158A. I'm talking about 49111C. 49111C is not part of the compact. 49111C is... But it's a federal statute that talks about the power Virginia has. Right. 49111C has to be interpreted in, I guess, maybe in parametria with 158A because they are the same thing. Wait, the more specific Virginia statute controls the meaning of a federal statute? I'm sorry, Your Honor. Let me just try and explain how we understand it. So we believe that the Transfer Act, as I was trying to explain, Congress recognized it needed to retrocede jurisdiction from the federal enclave back to making it joint jurisdiction. And in 158A, it says the Commonwealth hereby grants, accepts, and agrees. So it's agreeing to what Congress has offered and said we're agreeing to it. The language, I think, is virtually the same. So that was 158A and here is Virginia's... So, no, it's not quite the same. But so they were accepting what Congress offered in 158A. And 158C is the key example of the reservation of powers that Virginia understood how, if it wanted to reserve power, it could reserve power for the state police. And that was the only part of the... We argued that below. The district court accepted that analysis and said, yeah, that's how it works. If you want to reserve it, you have to be specific. They were specific as to the state police. And they didn't... That's all they were specific to. And if seven words could have been added to 158C to say NDOLI can enforce its regulations too. Or 158C could have been written entirely different. But I did want to respond to one thing. I'm sorry, can I just make just a clarifying question? I assume you think that even if Virginia had written the statute differently, it still wouldn't be part of the compact unless DC passed a reciprocal statute. Correct. So there was a suggestion that there are pieces of the compact that recognize the jurisdiction of the Virginia courts and Virginia law and that that somehow brings into...brings into...brings over the airports authority all of Virginia law. And that idea was explicitly rejected by the Attorney General in its 2012 decision in the Marshall case on Joint Appendix 63. Again, it says finally the fact that MY is subject to suit in Virginia does not mean that MY is also subject to the Freedom of Information Act. And that's the principle I've been trying to advocate. It's the principle we have advocated throughout these proceedings that preemption analysis stands the whole idea of how compacts work on its head. And I want to say one thing about preemption analysis and the way that... So Terrence also says that one of the things we look at is the course of performance. So what do I do with the fact that you apparently acquiesced in Doley regulating you for a whole long time? And I get your...before you say this, I imagine you're going to say, well, that was tolerable when they weren't trying to fine us, but now it's intolerable because they're trying to fine us. I don't know why legally that matters. If you submitted to their authority, you've submitted to their authority, and the fact that Virginia decides later they need different remedies, I don't know why that matters. Well, I think the record is actually clear about...the record doesn't have a lot in it as far as when the airports... when Doley first decided it had power to regulate the airport's authority. But the commissioner in his administrative decision, Joint Appendix 17, said, In addition, the language used to define public employer was adopted during a Virginia Safety Health Codes Board meeting back on September 15, 2005. It changed the meaning to include agencies, authorities, its underlying instrumentalities, underlined as new, or any political subdivision of the public or public body. This definition was unanimously passed and became effective on September 21, 2006. So this is when...this is what the commissioner said is the basis of his authority. And then I'd like to call your attention to the stipulations in this case, the administrative stipulations signed by Doley and by myself. Joint Appendix 28 says, NY has consistently taken the position, at least since 2006, same date, same year, that as an interstate compact agency, it's not subject to the jurisdiction of the Department of Labor or an industry. So Doley changed its idea of what a compact agency was, and we responded by... With all respect, why does that matter for purposes of whether they have authority to regulate? Because they said that...in the first part I read to you, the commissioner is saying our jurisdiction... As a matter of Virginia state law, who cares what Virginia... I think I can take as a given that states of the union don't regulate all... don't regulate in the sense that they don't actively regulate all sorts of things. They would have the power to regulate, they just choose not to. Well, so what I understand the commissioner to have said in his opinion about what happened in 2006 is that they changed their regulations. So the regulations can have different scope in terms of employers... Your view is that Virginia law can say literally whatever Virginia law wants to and they still can't regulate you. Well, I was responding to the pattern of jurisdiction, the pattern of practice that you were asking about, and I was saying that it was not at all established in the record in this case that prior to 2006, Doley believed that it had the authority. It only articulated that it had the authority, at least according to what the commissioner said in 2022, it articulated that authority in 2006, the same year the airport's authority recorded that we don't agree with you. So we haven't really acceded to it, we've objected to it. Ms. Bailey began her argument by highlighting the fact that absent the department's intervention, you have a regulatory vacuum because the workers who work for the authority as opposed to the airports would not have any protection with respect to labor laws. So is there a regulatory vacuum? What are the protections that they otherwise would have? Well, the airport's authority has its own safety department or safety group that enforces the airport's authority's own safety regulations. The regulations are contained in the appendix. When the United States owned these airports and operated these airports, the FAA was not subject to Virginia jurisdiction or to OSHA. OSHA doesn't apply to federal agencies. It's not clear to me, and we've declined to take a position on it. Hold on, wait, hold on. When there are federal employees, there's the Federal Tort Claims Act, right? Sure. Oh, well, isn't it FILA? FILA, yeah, I was right. I'm sorry. Federal statutes allow you to sue the federal government when the federal government does bad things to you, right, when a federal employee does bad things to you. Yes, well, there's workers' compensation. Workers' compensation applies equally here. There's no question about that. And there's no question that, I mean, I guess regulatory absence here is not something we would, I mean, we have abated all the violations. I mean, that's the status quo is voluntary participation. Let me put it this way to pick up on the Chief's question. Say a person who's employed by the authority is catastrophically injured as a result of the gross negligence of his employer. Who, if anyone, can sue his employer for that? Well, workers' compensation laws, regardless of where you are in this country, would preempt a private cause of action, and the employee would have a cause under the workers' compensation laws. Against the authority? Yes, yes. So I did want to just talk about one thing about Tarrant. Tarrant talks a little bit about, Tarrant is mostly cited for the proposition that in interpreting compacts, you have to look at the express language of the compact. And it's notable that in Tarrant there was ambiguity because both parties were looking at it from, they were both looking at the absence of text addressing the issue of water rights across state lines. Here, we have relied upon express provisions of the compact. They're set out in detail in Joint Appendix 42 to 43. They're set out in detail in page 26 to 27 of the brief. So we are relying upon express text. The interpretive tools that the Commonwealth is relying upon, including the idea about ambiguity or courts being reluctant to see a secession of state authority, that's only part of an interpretive tool that you get to if you believe that the text of the compact is ambiguous. The Commonwealth, or Dole has never asserted here that there's any ambiguity. They simply say we didn't reserve it. We say you've got it, you're standing the analysis on its head. But the text of the compact, in our opinion, is quite clear. I wanted to say one other thing about the idea of conflict, which is the idea of preemption. That's not the standard that's created in the compact. The compact, it's Section 177 of the compact, says, I'm sorry, as other general or special laws inconsistent with any provision of this act are declared to be, I'm sorry, all other general or special laws inconsistent with any provision of this compact are declared to be invalid. And inconsistent is not the same thing as conflict. I would refer this case, this court, to the Alcorn case, a decision of the District Court for the District of Columbia, which applied it only on the basis of inconsistency relating to the appointment of a member of the Airports Authority board. There's nothing specific in the compact about who has to approve the appointment. The governor said he has to, is subject to legislative approval. Alcorn, the District Court said no, that would be inconsistent with the independence of the Airports Authority required by the compact. Go ahead. Mr. Happen, so from your perspective, it matters not how we describe this document, whether it's a conventional bi-state compact, something less than that, a regular old agreement, the terms of the agreement? I wouldn't say we don't care about it. Well, why does it matter, I guess is what I'm asking. Do you get to the same result? You do get to the same result, but we would prefer, although I will agree that it's not a holding in Kirpin that this is a compact, I also think it's not exactly dicta, at least in the sense of a stray remark. Three times in Kirpin, this court referred to the Airports Authority as a multi-state jurisdiction. And what's, or a classic example, and the reason I think that's important is, count one of the complaint as described by the District Court in its opinion, was a specific attack on the Airports Authority based on the fact that it was not an interstate compact. The District Court didn't rule on that, although it offered kind of an advisory opinion, but it didn't rule on that perhaps, Your Honor, the way you're thinking about it. It ruled that said, oh, the district has every capacity to enter into a contract that's guaranteed under the Home Rule Act, and that's how he finessed the issue, although he did, as I said, offer an advisory opinion. But I just don't think it's quite fair to say that Kirpin, I admit it's not a holding, but it's not dicta either. Anyway. Well, and it's in the course of saying the entity is not X, the entity is not Y. Right. The entity is Z. Right. Thank you, Your Honor. That was my question. Okay. Thank you, Mr. Hepburn. Ms. Marley. I'd like to address three points in rebuttal. And first, as to Judge Hayton's question about the meaning of police power and 49111C, we completely agree. Police power is a very broad term with an established meaning as a legal term of art, and it's the state's broad power to protect health and safety, and that includes workplace safety. Can I just ask you a quick question about that? Sure. I mean, I totally understand what you're talking about. That is how I would read police power in a vacuum, and it's probably how it's properly read in the federal statute. But what happened in Virginia when they put it into a provision that is actually titled police and all of the other sections are actually about law enforcement policing? Did they just put it in the wrong place? Well, the Virginia provision, much of that, but by no means all, is about state police specifically. But it also does explicitly refer back to the federal act, which is weird, right? If you were just reading this provision in context, just this provision, it says police. It's about, I mean, every other provision is about actual law enforcement policing. Well, not Section D. Section D is broader than that. It's mutual aid, which includes transportation and emergency workers. But I think the more important point is that Section A expressly cross-references the federal act, and they say we are accepting and confirming the retrocession of our police power as set forth in this federal statute. And the federal statute, in turn, it doesn't say anything about Virginia state police. It's just using the term police power. There's no reciprocal provision in the D.C. statutes, right? Doesn't that sort of, by itself, establish that this is not part of the compact? No, it's controlled by the terms of the federal statute. Even if you were to look at this... This isn't the federal statute that approves the compact. That was back in the 1950s. It does approve it as well. And you think until this transfer act, there was no compact? Well, certainly, if this isn't an interstate compact under the compacts clause, then that 1959 law alone would not be enough to turn this agreement, reciprocal legislation, into federal law. That makes me... Because Kirpin, I think, is very clear about this. This was approved in the 50s. It came into being with these reciprocal state statutes. After that, after it was created, there's this transfer act, which doesn't affect the terms of the compact itself. I believe it does affect the terms of the compact. Again, even setting aside that question about the 1959 legislation, I don't believe that the authorities even disputed that the transfer act is also federal consent to the agreement between the District of Columbia and the Commonwealth of Virginia. I'm pretty sure they are disputing that a provision that appears in the transfer act and in the Virginia Code, but not in the D.C. Code, is part of the compact. They do dispute that, but if the court looks to, for instance, Petty v. Tennessee-Missouri Bridge Commission as a Supreme Court decision, and in that decision, there was a provision in the federal legislation that wasn't in either of the state reciprocal agreements, and the court held there that that was part of the compact, and that it determined the preemptive effect of the compact because Congress has the power to impose conditions on its consent, and if the states thereafter act under the compact, they're accepting that condition. So if this is looked at as an interstate compact, that's exactly what happened here. The District of Columbia, despite filing an amicus brief in this case, is not disputing that this is part of the agreement. At any rate, if it's looked at as a compact, it became part of an agreement because it's a condition that Congress placed in the federal legislation. You think that the concurrent police provision is a condition of Congress' approval of the compact? Yes. And I see my time has expired, so if the court has no further questions, we respectfully request the judgment below be reversed. Thank you, Ms. Bailey. Thank you both for your arguments. I'll come down and greet counsel and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, Pamela A. Harris, Toby J. Heytens